**Commonwealth v. Cruz**

*Donald R. Totaro, assistant district attorney,* for the Commonwealth.

*Barry G. Goldman* and *G.D. Anthony,* for defendant.

PEREZOUS, *J.,* December 15, 1992—Before the court for disposition is defendant's, Ricardo Cruz, petition for transfer of proceedings to juvenile court. Defendant, age 14,[1] is charged with criminal homicide and criminal conspiracy in the death of Debbie Rivera on March 9, 1992. These charges emanate from a shooting at an elementary school playground on an early Monday evening. The Commonwealth has indicated that it is not seeking the death penalty.

An evidentiary hearing was held on August 31, 1992, and the issues have been briefed. After a review of the evidence and applicable law, we refuse to grant defendant's request.[2]

In a murder case involving a juvenile defendant, jurisdiction remains with the criminal court. The case may be transferred to juvenile court if the juvenile is able to show that he is amenable to treatment or rehabilitation within the juvenile system. *Commonwealth v. Pyle,* 462 Pa. 613, 342 A.2d 101 (1975). The Court of Common Pleas has discretion because transfer in a murder case is not a matter of right. *Commonwealth v. Leatherbury,* 390 Pa. Super. 558, 561, 568 A.2d 1313, 1315 (1990), (citing *Commonwealth v. Zoller,* 345 Pa. 350, 355, 498 A.2d 436, 439 (1985)).

The factors to be considered by the court in ruling on a decertification or transfer petition were stated in *Pyle, supra:*

1. At the time of the incident, March 9, 1992, Ricardo Cruz was 13 and 1/2 years of age, having been born on June 28, 1978.

2. This opinion is filed in support of our order entered on October 30, 1992, prior to the commencement of trial on November 2, 1992.

"[T]he determinative factors in deciding whether the youth is amenable to juvenile treatment will differ from case to case. Such determination should be made after careful review of the individual child's personal make-up (e.g., mental capacity and maturity as determined by consideration of his home and school environmental situation, emotional attitude and pattern of living) his previous history (including any previous contact with law enforcement agencies and/or juvenile courts) and the nature and circumstances of the alleged homicide (e.g., inquiry into whether the killing was committed in an aggressive, violent or willful manner, whether the safety of the community requires lengthy incarceration, whether it is more desirable to dispose of the entire offense in one court should the juvenile's associates in the alleged homicide be adults not within juvenile jurisdiction)." 462 Pa. at 623, n. 14., 342 A.2d at 106-107, n. 13. (emphasis in original, citations omitted)

This court has considered very carefully defendant's age, defendant's maturity, the act leading to the charge of the homicide, defendant's mental capacity, defendant's degree of criminal sophistication and defendant's previous history. This opinion will address each factor in light of the evidence presented at the hearing and in view of the arguments presented by counsel.

## I. Defendant's Age

At the time of the incident, defendant was 13 and 1/2 years of age. Defendant's age is significant for several reasons. The first reason concerns the primary issue of whether this defendant is amenable to treatment and rehabilitation under the juvenile system.

At the time of the incident, defendant was approximately 3 and 1/2 months from his 14th birthday and at the time of the hearing was 6 years and 10 months from age 21.

In effect, this means that defendant would have less than seven years for rehabilitation and treatment in the juvenile system. For reasons which will be discussed in the sections to follow, this period of time does nothing to enhance the possibility that defendant will be rehabilitated by the juvenile system. Given this period of time, the serious nature of the crime, defendant's history in the schools, age is a factor militating against the transfer of this case to the juvenile court.

Ricardo Cruz has enough of a track record to support a very guarded prognosis of the possible success of treatment in the juvenile system. Defendant's school record is one of truancy, lack of appropriate behavior and failure to participate at even a minimal level.

He has been described as "much more mature than the average 13 year old." (N.T. 115)[3] The description of defendant through his school records and prison records, the observations of teachers and counselors and Detective Abel, the arresting officer, indicate to the court that defendant is in many ways older and more sophisticated and worldwise than many adults. Therefore, given the record he has established by the age of 14 and the relatively short period of time from the present date until his 21st birthday, the court finds his age to be one factor which provides neither support nor encouragement for the position that he can be rehabilitated in the juvenile system.

## II. Defendant's Maturity

The record established at the hearing in this case shows that defendant is at least of average maturity for his age. In fact, William H. Myers, Ph.D., a psychologist who testified for the defense, described Ricardo Cruz as having

---

3. All reference to notes of testimony are from the decertification hearing held on August 31, 1992.

a fairly normal conscience and as "knowing right from wrong." (N.T. 38) Dr. Myers went on to state that one impression he had of Ricardo was that he seems to be older than he is.

Jerome I. Gottlieb, M.D.,[4] a psychiatrist who interviewed defendant described him as "fairly mature for someone of his age; certainly not just physically. The physical appearance does contribute to the aura, but he seemed very streetwise, very much in control, very much relaxed." (N.T. 79) The doctor further stated that Ricardo was composed. "He did not seem to experience any anxiety during the interview, even though the circumstances would certainly be difficult for anyone." (N.T. 79) Moreover, in speaking with the correction officers at Lancaster County Prison, the officers "universally said that he [Ricardo] is way beyond his age in terms of his behavior, that they said he could easily pass for a young adult, 18 or 19 years of age, just the way he related to them: his lack of fear, just the way he spoke with them." (N.T. 80)

Defendant himself has shown indications of understanding the expectations of certain programs and what was required of him. Of particular importance are the comments that he made to a teacher at Hand Junior High School following the teacher's decision to send defendant to the assistant principal for suspension. Defendant stated that "he was through playing with me. This is the third time that 'I' had sent him out for suspension." Defendant then told me that "I had better watch out because he was going to lay me out." Defendant followed that state-

---

4. Dr. Gottlieb testified for the defense in the transfer hearing for one of the co-defendants. However, Dr. Gottlieb emphasized that the co-defendant did not comment about Ricardo Cruz nor his participation in the shooting.

ment up by saying that the next time he sees me he is going to "kick the s--- out of me." Defendant then turned to leave the room, muttering things under his breath about "beating my f------ a-- if I [defendant] ever got suspended again." (Commonwealth's Exhibit 2, memo from Trey Jackson dated February 6, 1992) This shows a degree of maturity that is applied in a less productive manner. These examples, together with the records admitted into evidence at trial and the testimony of witnesses at the hearing, paint a picture of a person who is a mature 14 year old.

### III. The Nature and Circumstances of the Acts for Which the Transfer is Sought

The act in question took place at the playground of the Carter & MacRae Elementary School in Lancaster City. According to defendant, the shooting occurred because "Fuzzy was f------ with Carlos (co-defendant Carlos Santiago)," (Commonwealth Exhibit 6, p. 12-13) thus indicating revenge against Fuzzy Warren as the motive for the shooting. Defendant and co-defendants, Elvis Torres, Carlos Santiago and Tony Santana, met in an alley and talked about "getting Fuzzy—shooting him." (Commonwealth Exhibit 6, p. 7) Then defendant and co-defendant Tony Santana walked to the basketball courts at Carter & MacRae where they saw Fuzzy Warren. They then walked back to 237 Beaver Street, where co-defendants Carlos Santiago and Elvis Torres were waiting. Defendant and the three co-defendants were "at two cars parked at the school lot on Beaver Street" when they began to fire in the direction of Fuzzy Warren. (Commonwealth Exhibit 6, p. 9) Although there is some question as to who actually shot the .45 caliber automatic handgun, by his own admission, defendant carried and

shot three rounds of a .22 caliber sawed off shotgun. (Commonwealth Exhibit 6, pp. 12-13)

Defendant argues that although a person is dead, there was not a high degree of violence involved in this case. We disagree. Moreover, we are shocked by defendant's characterization of this crime as "nonviolent" in nature. This court can think of no more violent crime than to shoot into a crowd of innocent victims with a total disregard for the consequences of that action. The fact that Miss Rivera and not Fuzzy Warren was shot and killed by defendants' shooting might be construed by defendant as an accident; however, the act of shooting a .45 caliber handgun and a .22 sawed off shotgun, both considered deadly weapons, into a crowd of innocent victims does not appear to be an accident under any interpretation of the facts. That the act happened in this manner is strong support, in and of itself, for the denial of this transfer request.

### IV. Defendant's Mental Capacity

In support of his argument that he is amenable to treatment as a juvenile, defendant offered the testimony of psychologist, William H. Myers, Ph.D., who testified that defendant, at the time of the shooting, was suffering from an adjustment disorder. According to the defense expert, the essence of an adjustment disorder is that the person has a maladaptive response to a stressful situation. When they are stressed, they try something that tends to make things worse. Here, the defense expert stated that defendant tends to be impulsive and gets quite angry. Defendant's theory on amenability is that proper counseling in the juvenile system will assist this defendant to respond properly to stressful situations.

In its simplest form, the defense argument seems to be that because defendant has adequate mental capacity,

can appreciate right from wrong, has expressed some remorse for his actions, and has responded to treatment in the past, he is a perfect candidate for rehabilitation and supervision in the juvenile system.

Defendant's argument totally ignores Dr. Gottlieb's opinion that defendant has a problem with impulse control and aggressive behavior, with a pattern of increasing severity dating from 1986.[5] Dr. Gottlieb believes that defendant suffers from a conduct disorder under socialized aggressive type as he has shown a prominence of antisocial behavior and does not experience remorse for his actions. Moreover, he does not seem to appreciate the consequences of his actions. In fact, defendant has attempted to minimize his responsibility for his past actions and attributes blame to others. According to Dr. Gottlieb's expert opinion, conduct disorder is sociopathic behavior. Moreover, individuals suffering from this type of disorder are not amenable to treatment.

After a review of the hearing testimony and the record before us, we believe that defendant's argument ignores the fact that defendant has shown virtually no interest in any program offered to help him or to rehabilitate him. From the school records, the alternative school records and the reports from the psychologists and psychiatrists, it appears that defendant is of at least average intelligence and that he was suffering from no mental disorder such as would limit his ability to understand and appreciate the extent of his actions. His mental capacity appears to be normal for his age.

---

5. Dr. Gottlieb identified this pattern of aggressive behavior as the defendant's repeated fighting in school, many unexcused absences from school, terroristic threats, substance abuse of cocaine and the numerous incidents at Lancaster County Prison.

## V. Defendant's Degree of Criminal Sophistication

While defendant attempts to minimize the criminal nature of his actions, the record clearly supports an individual who has absolutely no regard for the value of human life. The record also evinces a defendant who acted with a high degree of criminal sophistication before and after the murder of Debbie Rivera.

According to the statements of the co-defendants, it was this defendant, Ricardo Cruz, who was upset with Fuzzy Warren—it was this defendant who decided to go to the Carter & MacRae Elementary School playground armed with deadly weapons. Defendant's own expert witness agreed that, if the statements of the other co-defendants are accurate, this defendant was, in fact, the leader of the group rather than a follower.

Defendant exhibited further sophistication by borrowing a black coat, with no markings and a hood, before heading to the playground. Defendant acknowledged, in his statement to police, that he did so because he didn't want anyone to see him. *Id.* Moreover, defendant deliberately maintained a distance of over 50 yards from the intended victim.

Finally, this court places great weight on defendant's continuous but contradictory statement to the police following his arrest. Detective Abel testified that defendant changed his story several times, each time trying to blame co-defendants for the fatal incident. Initially defendant denied ever being present at the crime scene. He then changed his story to say that he was present but not carrying a gun. Finally, defendant stated that he was carrying a gun, but it wasn't the .45 caliber gun that inflicted the fatal wound. *Id.*

Defendant continued to exhibit a high degree of criminal sophistication while awaiting trial. According to defen-

dant's own expert, defendant gave answers to questions so that others would think that he is good. The Commonwealth's expert also found defendant capable of trying to make himself appear in a better light.

These examples, and the totality of the evidence, portrays defendant as "worldwise," "street-smart" and possessed of a degree of sophistication which he chose to apply in a criminal way. That defendant tends to apply his intelligence, his understanding and his sophistication in a criminal or antisocial manner is evident throughout his school, alternative school and prison records. He has a level of criminal sophistication which tends to support the denial of his transfer request.

## VI. Defendant's History

### A. School Records

Unfortunately, this defendant has a long and disturbing history in the school system. A review of his school records, which were admitted into evidence as Commonwealth Exhibit 2, show that he was largely unsuccessful in school. According to the records from the New York City School District, defendant was suspended for five days in November of 1987 for "another fight" and for "looking under a girl's dress." Lancaster City School District records show that on September 30, 1991, defendant's mother was sent a letter notifying her that defendant was excessively absent and all future absences would be marked unexcused or illegal unless a medical note was presented upon his return. On November 15, 1991, defendant was suspended from school for using foul language. On November 18, 1991, a disciplinary summary indicated that defendant "had been a behavior concern since he entered Lincoln this school year. As the year progressed, his behavior has not improved. Ri-

cardo has had six discipline referrals and has been suspended three times." On November 25, 1991, defendant was suspended for laughing and disruptive behavior. On December 5, 1991, defendant was suspended for writing on school property. On February 7, 1992, defendant threatened to physically assault a school teacher. In fact, the teacher stated that although he had been confronted several times by other persons this was the first time he really felt the student would carry out the threat.

As a result of defendant's chosen antisocial behavior, he was placed in the Alternative Education Program (Buerhle Alternative School) for the School District of Lancaster. According to Principal Kiefer, defendant was only enrolled for seven days. Of those seven days, defendant was illegally absent on four days and left without permission on the three days that he did attend. Defendant's grades for the 1991-1992 school year were all failures.

Defendant's school records tell a story of a lack of motivation, lack of attendance, lack of cooperation and nearly consistent and uniform failure. His records show that he developed a pattern of ignoring or rejecting any opportunities that were presented to him. He consistently failed to accept or avail himself of assistance. To accept that defendant is going to participate at this time in rehabilitation programs would be to ignore a record which is quite to the contrary.

## B.  *Institutional Records*

Among the more disturbing evidence developed at the hearing concerns defendant's behavior in prison. A review of defendant's records from the Lancaster County Prison since his incarceration reveal antisocial and criminal behavior. Despite being admitted to the prison following the shooting of another person, he was described as "calm,

rational and showed no distress or depression." (N.T. 96-97)

Bonnie Bair, a mental health/mental retardation counselor at Lancaster County Prison testified that defendant received 17 misconducts between April 6, 1992, and August 16, 1992. On April 6, 1992, defendant was cited for possession of a weapon in that defendant sharpened and honed a toothbrush into a sharp point. On April 9, 1992, and June 15, 1992, defendant was cited for striking a prison officer. On June 15, 1992, and again on July 11, 1992, defendant was cited for spitting on prison officers. On June 27, 1992, defendant assaulted another inmate with a bucket of water. On July 5, 1992, defendant was found with a hacksaw blade in his possession. On August 16, 1992, defendant was cited for attempted assault on a prison officer with a broken broom handle.

Ms. Bair also testified on cross-examination that defendant "has more misconducts than your average inmates." (N.T. 107) Defendant blames his failure to adapt to prison life, manifesting itself in the large number of misconducts received, on his young age, his low self-esteem, the prison guards and the prison environment. This argument totally ignores the fact that there are three other inmates of similar age to defendant, also awaiting trial for homicide, who have learned to adapt to prison life without resorting to violent behavior. According to the testimony of Ms. Bair, one of these inmates does not have any misconducts, while the other two have "two or three, tops." (N.T. 108)

It is disturbing and enlightening to note that this conduct took place while defendant has been in prison awaiting trial on murder charges. It also flies in the face of the defense argument that defendant is someone who wants to and can be treated over the next seven years to the

point where he would be considered rehabilitated from his prior history of criminal activity.

## VII. Nature and Extent of Prior Delinquent History

This court acknowledges that defendant has no prior delinquency determinations or probation history. However, there was testimony of defendant engaging in other delinquent behavior prior to the present offense, in the nature of substance abuse, lying, truancy from school and inappropriate behavior in school. This pattern of behavior belies defendant's argument that he deserves at least one chance to rehabilitate himself within the system. The factors in this case do not warrant such a generous disposition. Defendant's need for care, guidance and control as a juvenile is far outweighed by society's need to prevent defendant's further aggressive and violent behavior.

## VIII. Whether Defendant Can Be Rehabilitated Prior to the Expiration of Juvenile Court Jurisdiction

Considering all the evidence upon balance, we find that there is simply no persuasive evidence that defendant can be rehabilitated prior to the expiration of juvenile court jurisdiction. While defendant is relatively young and has not been previously involved with the juvenile court system, his mental capacity and maturity are sufficient such that his poor performance in all areas reflects choice, not mental deficiencies. While defendant possesses the ability to make good judgments, he chooses to act in a violent and antisocial manner. Defendant's degree of criminal sophistication lends credence to our view of defendant as a violent and aggressive person.

Defendant has been offered significant opportunities in the school system. He has been placed in the Buerhle

School, an alternative school in the Lancaster School District. The Buerhle School provides a learning environment with the kind of structure and assistance necessary for students who are not enjoying success in the mainstream. He has been offered opportunities, special programs and second chances. His record shows a complete and total lack of success. It appears that an essential ingredient missing in these programs, opportunities and second chances is defendant's own motivation to do better. It is this consistent theme which, under the totality of the circumstances of this case, leads this court unalterably to the conclusion that defendant is not amenable to treatment or rehabilitation in the juvenile system. Therefore, defendant's petition for transfer to the juvenile system will be denied.